## HARRY N. FORSEEN v. TIRE RETREAD COMPANY, INC., AND ANOTHER.

136 N. W. (2d) 75.

June 18, 1965—No. 39,677.

*Lewis, Hammer, Heaney, Weyl & Halverson* and *K. C. Weyl,* for relators.

*Greenberg & Greenberg* and *Malcolm H. Greenberg,* for respondent.

ROGOSHESKE, JUSTICE.

Certiorari to review proceedings before the Industrial Commission resulting in an award of compensation to employee-respondent, Harry N. Forseen, for personal injury to his back arising out of and in the course of employment.

The employee worked as a tire "tacker" for Tire Retread Company, Inc., of Virginia, Minnesota. His job was to prepare tires for retreading by boring into cut portions and smoothing the surface with a portable buffer. While he worked on the tires they were placed in a portable dolly, but he found it necessary in the course of his job to handle the tires, to pull, and to shove them. Since some of the tires were used on off-the-road mining equipment, many were quite large, measuring up to 7 feet in diameter and weighing 600 to 1,100 pounds. On September 7, 1961, he performed his duties as usual, and during the course of the day he was compelled to pull some "1100 x 20" truck tires (not the largest tires in the shop, but heavy-duty diesel tires) up a plank incline while a fellow worker pushed from a lower level. When he performed this activity he felt no strain, he did not slip or fall, and he experienced no pain. The next morning he awoke with pain in his lower back centralized just over the belt line on his right side. Prior to this time, he had never experienced any trouble with his back.

Although he continued to work, he continued to have pain. He consulted his personal physician who referred him to Dr. William S. Pollard, a Duluth neurosurgeon. Dr. Pollard first examined him on October 3, 1961. The examination revealed that he had a partial loss of feeling in the lower right leg and a diminution of the right ankle reflex. Upon the examination Dr. Pollard diagnosed the problem as a protrusion of the fifth lumbar disc. After three more examinations, the employee was admitted to a Duluth hospital where a myelogram, an X-ray technique, revealed a fourth lumbar disc protrusion. He submitted to surgery on December 13, 1961, when Dr. Pollard removed the fourth

lumbar disc, having found it to be bulging. He also inspected the L-5 disc and found it normal.

After a period of healing during which he was treated by Dr. Pollard, the employee returned to work on March 20, 1962. He performed his usual duties until May 6, 1963. Although his operation at first relieved him somewhat, he worked with considerable pain in his back, hips, and legs. He consulted a chiropractor in June or July of 1962, but found no relief. He last saw Dr. Pollard in the fall of 1962. Finally, in late April of 1963, he consulted Dr. Meyer Z. Goldner, an orthopedic surgeon in Minneapolis. After examination, spinogram and discogram studies were ordered; they were administered on May 29, 1963, and revealed an abnormality of the disc at the L-3-4 level. Dr. Goldner performed a laminectomy on August 8, 1963. He removed scar tissue from the previously explored L-5 area and from the L-4 area where the disc had previously been removed. He then removed as much disc material of the L-3 disc as possible. At the time of hearing in October 1963, the employee had been relieved of most of his pain and had found that he could be moderately active. Dr. Goldner stated that the healing period would extend into 1964.

Although employer-insurer paid benefits to the employee following his first operation, they now claim that it did so under a "mistake of fact." In stating the history of his pain to Dr. Pollard, the employee had mentioned that he had strained his back pulling tires up the inclined plank. This statement apparently was understood by the doctor to mean that the employee then suffered some injury or strain, at which time the pain began. It was not until the hearing on October 3, 1963, that the employee, on cross-examination, stated that he suffered no strain or injury while pulling the tires, that the pain did not begin until the following morning, and that his attribution of the pulling as the cause of his injury was only his opinion.

Dr. Pollard, called by employer-insurer, testified that the disc protrusion for which he operated could be caused either by a single trauma or by a progressive degenerative process. Although he was not sure of the cause at the time of his treatment, he expressed the opinion, based upon the history and further findings from tests and from Dr.

Goldner's operation, that the employee was "the victim of a progressive degenerative condition involving the discs of the spine" not due to trauma but probably, although not to a medical certainty, "due to a hereditary factor." Dr. Goldner, testifying on the employee's behalf, also concluded that the employee had a progressively degenerative disease of the lumbar discs.

Relators, now denying coverage, contend that the employee's injury did not arise out of and in the course of employment because it was caused by a preexisting degenerative disease. The referee ordered compensation, explicitly explaining in a memorandum that the employee's "heavy labor for a period of time prior to September 7, 1961" accelerated or aggravated his preexisting condition. He based his decision upon Gillette v. Harold, Inc. 257 Minn. 313, 101 N. W. (2d) 200. The referee's decision was affirmed by the commission, one member dissenting on the ground that the weight of the evidence did not support the finding but rather "that it is just as likely that the disc condition was caused by hereditary degeneration and his daily living."

We think that this case is directly controlled by Gillette. In that case the claimant was a saleslady in a ladies' ready-to-wear store. She suffered from a preexisting degenerative condition of the foot that was aggravated and accelerated by the standing and walking necessary in her employment. Recognizing that her infirmity was not an occupational disease as defined in Minn. St. 176.011, subd. 15, we held that her disablement was a compensable personal injury under §§ 176.021, subd. 1, and 176.011, subd. 16, saying (257 Minn. 321, 101 N. W. [2d] 206):

"It is well established by the authorities that when the inevitable effects of an underlying condition are hastened by an injury that is sudden and violent or the result of unusual strain or exertion, the injury and its disabling consequences are compensable. It should further be conceded, however, that injuries may arise out of and in the course of the employment which do not occur suddenly or violently. In the course of one's ordinary duties injuries may occur daily which cause minimal damage, the cumulative effect of which in the course of time may be as injurious as a single traumatic occurrence which is

completely disabling. We have been presented with no good reason why compensation should be paid in one instance and not in the other."

It is thus clear that an employee may receive benefits upon disablement if his work activities aggravated his infirmity, even if they did not do so because of some unusual or violent strain or exertion. But, as we said in the Gillette case, "[t]he important question is whether the employment is a proximate contributing cause of the disability." 257 Minn. 322, 101 N. W. (2d) 206.

Keeping in mind that we will not disturb the findings of the Industrial Commission unless manifestly contrary to the evidence, we find sufficient evidence here to support a conclusion that employment contributed to the disablement. It is uncontradicted that the employee was compelled to move, push, and shove heavy tires in the normal course of his work. Robert A. Day, general manager of his employer, testified that this activity "takes a great deal of strength."

Both doctors testified that such work contributed to his disablement. Dr. Pollard testified:

"The Referee: Now, if this degenerative disease process were from heredity or from other causes, would this person that has this condition have a weaker back than the normal person?

"The Witness: Yes.

"The Referee: And if a person has a weaker back that has this condition than the normal person and does heavy work in nature, that is, the work of lifting and carrying tires and changing rims which appears to be rather strenuous labor, in your opinion, what, if any, effect does this type of work have on this process?

"The Witness: It would likely accelerate the changes in the disc and ligaments."

Dr. Goldner, who, unlike Dr. Pollard, did not base his opinion on any history of a specific incident of strain, described the process in this manner:

"A. Yes, I think that the repeated activities that he carried out were all in a sense strain to his back; may not have been any specific incident like falling off a ladder or falling into a hole, but the very

act of the activities that he carried out would put his back in the same situation that the tires that he was retreading; they were worn down that's why he was retreading the tires, that's why he is lifting them, pulling them, and the very activities he carries out are on the basis of certainly multiple strains to his back, and that this one day after he had been doing this work for an unknown period of time his disc structure or structures just gave out and caused him the pain."

The weight of this testimony, and the absence of any evidence tending to show any other external causes of deterioration, support the commission's determination and award of compensation.

Even though the employee's period of employment is not shown, and the record concerning the strenuous nature of his work leaves much to be desired and does not disclose anything of his off-work activities, the fact issue of causation is essentially one involving medical opinions which could have been resolved either way. In accord with Fisher v. Red & White Taxi Co. 270 Minn. 317, 133 N. W. (2d) 543, where we upheld a denial of benefits based upon the commission's determination of a parallel fact issue in favor of the employer-insurer, we must decline to disturb the award.

Attorneys' fees in the sum of $250 are allowed respondent.

Affirmed.